**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT<br>126 S Main Street, Suite B<br>P.O. Box 1770<br>Hailey, ID 83333,<br><br>ROCKY MOUNTAIN WILD<br>1536 Wynkoop Street, Suite 900<br>Denver, CO 80202,<br><br>and WILDEARTH GUARDIANS<br>301 N Guadalupe Street<br>Santa Fe, NM 87501,<br><br> Plaintiffs,<br><br>v.<br><br>THOMAS VILSACK,<br>in his official capacity as<br>Secretary, U.S. Department Agriculture,<br>1400 Independence Ave SW<br>Washington, DC 20250,<br><br>and UNITED STATES FOREST SERVICE,<br>1400 Independence Avenue SW<br>Washington, DC 20250,<br><br> Defendants. | <br><br><br><br><br><br><br><br><br><br><br><br>Civil Case No. 21-3056 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This case challenges the 2020 decision by Defendants United States Forest

Service ("USFS") and Thomas Vilsack, Secretary of the U.S. Department of Agriculture,

to amend the land and resource management plan ("Plan") for the Thunder Basin

COMPLAINT - 1

National Grassland ("TBNG" or "Grassland").[1] The 2020 Plan Amendment eliminates a Management Area specially designated as Black-Footed Ferret Reintroduction Habitat, increases poisoning and recreational shooting of prairie dogs—ferrets' exclusive prey—and substantially reduces the amount of acres devoted to prairie dog colonies.

2.      These management changes are problematic because the TBNG provides one of the last remaining areas with significant expanses of open mixed and short-grass prairies in Wyoming. Black-tailed prairie dogs are native to the Grassland, and as a keystone species they create habitat for a suite of other species, including mountain plovers, burrowing owls, and—potentially—reintroduced black-footed ferrets, a critically imperiled species listed as "endangered" under the Endangered Species Act ("ESA").

3.      First listed as endangered in 1967, scientists believed the black-footed ferret to be extinct until the discovery of a small remnant population in Wyoming in 1981. Scientists collected these few remaining wild ferrets for a captive breeding program, and all living ferrets now descend from these individuals.

4.      Black-footed ferrets rely solely on prairie dogs for prey and prairie dog burrows for shelter. Because of its potential to support prairie dog colonies of sufficient size to support breeding populations of black-footed ferrets, the TBNG has been identified as one of the most valuable potential reintroduction sites in the nation for this extremely rare species.

--------

[1] The Thunder Basin National Grassland is within the traditional lands of the Cheyenne, Crow, and Lakota peoples.

5.    The TBNG also provides habitat vital to the long-term viability of black-tailed prairie dogs, mountain plovers, and burrowing owls in Wyoming, all designated "Sensitive Species" by USFS's Rocky Mountain Region.

6.    USFS's 2020 elimination of "Management Area 3.63," its delegation of black-footed ferret reintroduction habitat management to the State of Wyoming, and its authorization of increased poisoning and shooting of prairie dogs on the Grassland violate Defendants' affirmative duty under Section 7(a)(1) of the ESA to "carry[] out programs for the conservation of endangered and threatened species . . . ." 16 U.S.C. 1536(a)(1).

7.    USFS's Environmental Impact Statement ("EIS") and Record of Decision ("ROD") for the 2020 Plan Amendment also violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, by stating an impermissibly narrow and unreasonable purpose and need, failing to consider a range of reasonable alternatives, and failing to take a hard look at impacts to black-tailed prairie dogs, multiple species dependent on prairie dog colonies for habitat, and potential black-footed ferret reintroduction efforts.

8.    Finally, the 2020 Plan Amendment for the Grassland violates the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, by failing to provide ecological conditions necessary to contribute to the recovery of federally listed endangered and threatened species, by failing to provide ecological conditions necessary to maintain viable populations of prairie dog-obligate species, and by failing to maintain or restore the ecological integrity of the plan area.

9.    Plaintiffs Western Watersheds Project, Rocky Mountain Wild, and WildEarth Guardians ask this Court to vacate and remand the challenged agency action in

the interest of ensuring the recovery of black-footed ferrets and the viability of other

species, including black-tailed prairie dogs, mountain plovers, and burrowing owls, as

required by law and as intended by Congress.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331

(federal question) and 16 U.S.C. § 1540(c), (g) (ESA), and may issue a declaratory judgment and

relief pursuant to 28 U.S.C. §§ 2201–02 and 16 U.S.C. § 1540 (ESA). Plaintiffs bring this action

pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the ESA citizen suit

provision, 16 U.S.C. § 1540(g), both of which waive Defendants' sovereign immunity.

11.    Plaintiffs provided Defendants with notice of Plaintiffs' intent to sue on January

26, 2021, and August 17, 2021, as required by 16 U.S.C. § 1540(g)(2).

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because federal

Defendants reside in this District.

## PARTIES

13.    Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit

conservation organization founded in 1993 with the mission of protecting and restoring

western watersheds and wildlife through education, public policy initiatives, and

litigation. Headquartered in Hailey, Idaho, Western Watersheds Project has over 12,000

members and supporters and works in eleven states across the West. Western Watersheds

Project has advocated for expanding prairie dog protections; for reintroducing black-

footed ferrets; for conserving other prairie dog-associated species including burrowing

owls, mountain plovers, ferruginous hawks, golden eagles, and swift foxes; and for

advancing innovative solutions to make livestock production more compatible with native wildlife species on the TBNG.

14.     Plaintiff ROCKY MOUNTAIN WILD is a non-profit conservation organization that protects, connects, and restores wildlife populations and wildlands in the Rockies. Rocky Mountain Wild has a long-standing interest in the habitat and species living in the TBNG and our members use areas within the TBNG for recreation, wild-life viewing, scientific exploration, and personal enjoyment. Rocky Mountain Wild has a demonstrated history of working to protect prairie dog populations and the federally endangered black-footed ferret.

15.     Plaintiff WILDEARTH GUARDIANS is a West-wide non-profit organization whose mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has over 190,000 members and supporters, including those who live, work, and recreate the TBNG region. For over 30 years, WildEarth Guardians has worked to restore and protect imperiled species, including black-footed ferrets and prairie dogs, the ferrets' obligates. WildEarth Guardians works to protect prairie dog habitat across the West, promote non-lethal prairie dog management to benefit both ferret reintroduction and the health of grassland ecosystems, and advocates for protecting ferrets to the fullest extent possible under the ESA.

16.     Plaintiffs' members and staff use the public lands within the TBNG, including lands within the eliminated Management Area 3.63 and replacement Management Area 3.67, for professional and recreational pursuits, including hiking, biking, camping, wildlife-viewing, photography, aesthetic enjoyment, and scientific and biological purposes. Plaintiffs' members

and/or staff have viewed and have concrete plans to view prairie dogs, mountain plovers, burrowing owls, and signs of their presence in the Grassland, including in the eliminated Management Area 3.63. Plaintiffs' members and/or staff have also viewed and have concrete plans to view prairie dog colony habitat in eliminated Management Area 3.63 that black-footed ferrets need for recovery and survival. Plaintiffs' members and/or staff hope to see the rare species reintroduced to the TBNG. For these reasons, Defendants' challenged action represents a direct threat to interests of all Plaintiffs. Accordingly, the legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests of Plaintiffs and/or Plaintiffs' members.

17.     Plaintiffs' staff and members' aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests have been, are being, and unless their requested relief is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual and concrete injuries, traceable to Defendants' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

18.     Defendant THOMAS VILSACK is the United States Secretary of Agriculture. In that capacity, Secretary Vilsack has supervisory responsibility over the United States Forest Service. Secretary Vilsack is sued in his official capacity.

19.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States within the Department of Agriculture charged with managing the TBNG and other units of the National Forest System according to federal statutes and regulations. USFS prepared and released the EIS for the 2020 Plan Amendment in May of 2020, and authorized the amendment through the ROD signed on November 6, 2020.

## NATIONAL ENVIRONMENTAL POLICY ACT

20.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1(a).[2] Congress enacted NEPA with the objective of "encourag[ing] productive and

enjoyable harmony between man and his environment" while "promot[ing] efforts which will

prevent or eliminate damage to the environment . . . ." 42 U.S.C. § 4321. To fulfill this stated

goal, NEPA requires federal agencies to analyze the environmental impacts of a particular

action before proceeding with that action. *Id.* § 4332(2)(c). In addition, federal agencies

must notify the public of proposed projects and allow the public to comment on the fully-

disclosed environmental impacts of a proposed action. 40 C.F.R. §§ 1506.6 & 1503.1.

21.     NEPA contains "'action-forcing' provisions to make sure that federal agencies act

according to the letter and spirit of the Act." 40 C.F.R. § 1500.1(a). Only after adequately

completing the NEPA process may an agency take action. 42 U.S.C. § 4332.

22.     The first goal of NEPA is to ensure informed decisionmaking. NEPA sets forth

specific procedural requirements federal agencies must follow as they carefully gather and

evaluate relevant information about the potential impact of a range of alternative courses of

proposed agency action on the environment. 42 U.S.C. § 4332. NEPA's second goal is to ensure

"that the agency will inform the public that it has indeed considered environmental concerns in

---

[2] On September 14, 2020, the Council on Environmental Quality's revised NEPA regulations
went into effect. *See generally* 85 Fed. Reg. 43,304 (July 16, 2020). However, the NEPA process
for the 2020 TBNG Plan Amendment occurred before the revised regulations took effect. All
references to NEPA regulations in this complaint are to the regulations in effect in May of 2020,
when USFS issued the Final EIS.

its decisionmaking process" and reveal available alternatives, thereby guaranteeing that the public is involved in and aware of agency processes. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); 40 C.F.R. §§ 1500.1(b), 1500.2(d)–(e), & 1506.6.

23.    The cornerstone of NEPA is the environmental impact statement that federal agencies must prepare and circulate for public review and comment. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4.

24.    Federal agencies must prepare an EIS prior to initiating any major federal action significantly effecting the human environment to ensure the environmental impacts are considered and disclosed to the public during the decisionmaking process. 40 C.F.R. §§ 1501.2 & 1502.5.

25.    An EIS must specify the underlying purpose and need for its proposed action. 40 C.F.R. § 1502.13. An agency's purpose and need for a proposed action must be reasonable based on the information before the agency, measured against the agency's statutory mandates. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) (citation omitted).

26.    An agency may not define the purpose and need for a proposed action "in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency actions, and the EIS would become a foreordained formality." *Citizens Against Burlington, Inc.*, 938 F.2d at 196 (citation omitted).

27.    The alternatives analysis is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. This section of an EIS should "provid[e] a clear basis for choice among options by the decisionmaker and the public." *Id.*

28.     An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

29.     An EIS must also "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits." *Id.* § 15012.14(b).

30.     The reasonableness of alternatives "is judged with reference to an agency's objectives for a particular project." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 709 (10th Cir. 2009) (citing *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004)).

31.     However, an alternative that runs counter to an agency's statutory obligations is not reasonable. *Id.*

32.     In an EIS, a federal agency must consider the environmental impacts of the proposed action, including adverse effects, consider alternative actions (including a "no action" alternative) and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the action. 42 U.S.C. § 4332(2)(C). This requirement is commonly referred to as the agency's duty to take a "hard look" at the environmental impacts of its proposed action. *See Natural Res. Def. Council v. Morton*, 458 F.2d 827, 383 (D.C. Cir. 1972).

33.     Federal agencies are required to evaluate three types of impacts, or effects. Direct effects are caused by the action and occur at the same time and place. 40 C.F.R. 1508.8(a). Indirect effects are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b). Cumulative impacts are the impacts on

the environment that results from the incremental impacts of the action when added to other past,

present, and reasonably foreseeable future actions regardless of what agency (Federal or non-

Federal) or person undertakes such other actions. 40 C.F.R. § 1508.7.

34.    NEPA requires federal agencies to consider three types of actions in an EIS:

connected, cumulative, and similar. 40 C.F.R. § 1508.25. Connected actions are closely related

actions that the Forest Service must discuss in the same impact statement. *Id.* § 1508.25(a)(l).

Connected actions are those that: (i) Automatically trigger other actions which may require

environmental impact statements; (ii) cannot or will not proceed unless other actions are taken

previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on

the larger action for their justification. *Id.* § 1508.25(a)(1)(i-iii).

35.    Cumulative actions are those which "when viewed with other reasonably

foreseeable or proposed actions have cumulatively significant impacts" should also be

considered in the same impact statement. *Id.* § 1508.25(a)(2).

36.    The information an agency uses in conducting its environmental review must be

"of high quality," and agencies "must insure the professional integrity, including scientific

integrity," of their discussions and analyses, and must "identify any methodologies used" and

"scientific and other sources relied upon for their conclusions." *Id.* §§ 1500.1(b) & 1502.24.

## ENDANGERED SPECIES ACT

37.    The Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, is "the most

comprehensive legislation for the preservation of endangered species ever enacted by any

nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress enacted the ESA to

"provide a program for the conservation of . . . endangered species and threatened species" and

"to provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

38.     In order to receive the full protections of the ESA, the Secretary of the Interior must list a species as "endangered" or "threatened" pursuant to Section 4 of the ESA. *See id.* § 1533. The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Under the ESA, a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

39.     The Supreme Court has held, "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost . . . reflected not only in the stated policies of the Act, but in literally every section of the statute." *Tenn. Valley Auth.*, 437 U.S. at 185.

40.     Section 7(a) of the ESA creates an affirmative duty to conserve listed species by commanding that all federal agencies "shall, in consultation with and with the assistance of" the relevant Secretary or representative wildlife agency (United States Fish and Wildlife Service for terrestrial species such as the black-footed ferret) "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species," 16 U.S.C. § 1536(a)(1), and "insure that any action authorized, funded, or carried out by [any agency] is not likely to jeopardize the continued existence of any endangered species or threatened species," *id.* § 1536(a)(2).

41.     Section 2 of the ESA defines "conserve" to "mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened

species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

42.     Insignificant measures that do not or are not reasonably likely to conserve ESA-listed species fail to satisfy a federal agency's Section 7(a)(1) obligations.

43.     For species listed or proposed to be listed under the ESA, Section 7(c) requires federal agencies to "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by [an agency's] proposed action." 16 U.S.C. § 1536(c)(1).

44.     Regulations promulgated to implement Section 7(c) require biological assessments to "evaluate the potential effects of the action on listed and proposed species . . . and determine whether any such species . . . are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a).

45.     "An analysis of the effects of the action" on species and habitat should include "consideration of cumulative effects." *Id.* § 402.12(a). Implementing regulations define "effects of the action" as "*all* consequences to listed species . . . caused by the proposed action," even those later in time or "outside the immediate area involved in the action." *Id.* § 402.02 (emphasis added).

46.     Congress amended the ESA in 1982, adding Section 10. Section 10(j) allows the Secretary to designate "experimental populations" of listed species authorized for release outside their current ranges "to further conservation of such species." 16 U.S.C. §§ 1539(j)(1) & 1539(j)(2)(A).

47.     When Congress amended the ESA in 1982, it specifically stated that federal agencies' obligations toward "experimental populations" pursuant to Section 7(a)(1) would not change. 16 U.S.C. § 1539(j)(2)(C)(i).

48.     For other purposes, the amended ESA now treats experimental populations of endangered species as "threatened" instead, and treats those experimental populations deemed non-essential as species "proposed" for ESA-listing except within units of the National Wildlife Refuge System or National Park System. *Id.*

## FOREST SERVICE POLICY DIRECTIVES AND PLANNING REGULATIONS REGARDING ESA OBLIGATIONS

49.     The Forest Service Manual ("FSM" or "Manual") articulates agency directives aimed at fulfilling its Section 7(a) obligations. First, the Manual states that USFS's policy regarding ESA-listed species is to place top priority on those species' conservation and recovery. FSM 2670.31(1).

50.     The Manual directs USFS to use the planning process to "establish objectives for habitat management and/or recovery of populations," and to use the biological evaluation process to determine the effects of proposed actions on listed species. *Id.* at 2670.31(2) and (3).

51.     The Manual also states that the agency's policy is to "[a]void all adverse effects on listed species," and to "[i]dentify and prescribe measures to prevent adverse modification or destruction of . . . habitats essential for the conservation of endangered, threatened, and proposed species." *Id.* at 2670.31(4) and (6).

52.     The Manual requires Regional Foresters "to ensure compliance with law and policy," and to "identify and approve management strategies to achieve conservation." *Id.* at

2670.44(1), (5), and (8). Regional Foresters are responsible for ensuring that the agency meets its ESA Section 7 requirements. FSM 2670.44(10).

53.    Forest Supervisors share responsibility with Regional Foresters to ensure "that legal and biological requirements for the conservation of endangered, threatened, and proposed plants and animals are met in forest land and resource management planning." *Id.* at 2670.45(1). Forest Supervisors must "develop quantifiable recovery objectives and develop strategies to effect recovery of threatened and endangered species." *Id.* at 2670.45(2).

54.    The Manual requires USFS to treat "experimental populations" of endangered species deemed "non-essential" the same as "threatened" species except for purposes of ESA Section 7(a)(2) consultation. *Id.* at 2671.43(1) & (5).

55.    Further, the Manual requires USFS to use biological evaluations to determine the potential effects of proposed actions on both listed and proposed species. *Id.* at 2671.44(1) & (2).

56.    A biological evaluation must include an "identification and description of all occupied and unoccupied habitat recognized as essential for listed or proposed species recovery. . . ." *Id.* at 2672.42(2).

57.    A biological evaluation must also include a determination of a proposed action's "effect on the species and the process and rationale for the determination," as well as "[r]ecommendations for removing, avoiding, or compensating for any adverse effects." *Id.* at 2672.42(5) & (6).

58.    USFS's  2012 planning regulations ("2012 Rule") require the agency to "provide the ecological conditions necessary to [] contribute to the recovery of federally listed threatened and endangered species." 36 C.F.R. § 219.9(b)(1).

59.    The 2012 Rule defines "ecological conditions" to include "the abundance

and distribution of . . . habitats" and "human uses." 36 C.F.R. § 219.19. "Recovery,"

meanwhile, is defined as "[t]he improvement in the status of a listed species to the point

at which listing as federally endangered or threatened is no longer appropriate." *Id.*

## NATIONAL FOREST MANAGEMENT ACT

60.    USFS, under the United States Department of Agriculture, manages the

National Forest System. *See* 16 U.S.C. § 1600(6).

61.    NFMA requires USFS to prepare land and resource management plans

("plans") for all unites of the National Forest System. 16 U.S.C. § 1604(a)

62.    NFMA also requires USFS to promulgate planning regulations that

"provide for diversity of plant and animal communities" in all units of the National Forest

System. 16 U.S.C. § 1604(g)(3)(B).

63.    In 2012, USFS promulgated regulations ("2012 Rule") that replaced

previous planning regulations. *See* 77 Fed. Reg. 21,162 (April 9, 2012) (now codified at

36 C.F.R. §§ 219.1 *et seq.*).

64.    In 2016, USFS revised the 2012 Rule to add additional direction regarding

the amendment of plans. *See* 81 Fed. Reg. 90,723 (Dec. 15, 2016) (now codified at 36

C.F.R. §§ 219.13(a)–(c)).

65.    Under the revised 2012 Rule, an amendment to a forest plan must be based

on a "preliminary identification of the need to change the plan." 36 C.F.R. 219.13(b)(1).

The need to change the plan may be shown by "a new assessment; a monitoring report; or

other documentation of new information, changed conditions, or changed circumstances."

*Id.*

66.     When amending a plan, the revised 2012 Rule requires USFS to apply the substantive provisions of 36 C.F.R. §§ 219.8 through 219.11 determined by the agency to directly relate to a proposed plan amendment. 36 C.F.R. § 219.13(b)(5).

67.     Within these substantive provisions, the 2012 Rule requires plans to "provide the ecological conditions necessary" to both "contribute to the recovery of federally listed endangered and threatened species" and "maintain a viable population of each species of conservation concern within the plan area," either through plan components or species-specific components. 36 C.F.R. § 219.9(b)(1). "Ecological conditions" encompass "the abundance and distribution of . . . habitats" and "human uses." *Id.* § 219.19.

68.     The 2012 Rule defines "recovery" as "[t]he improvement in the status of a listed species to the point at which listing as federally endangered or threatened is no longer appropriate." *Id.*

69.     A "viable population" is one "that continues to persist over the long term with sufficient distribution to be resilient and adaptable to stressors and likely future environments." *Id.*

70.     If "species of conservation concern" have not been designated for a particular National Forest System unit whose plan USFS intends to amend, the revised 2012 Rule requires the agency to determine potential species of conservation concern ("SCC") and "apply § 219.9(b) with respect to [those] species as if" they are designated SCC. 36 C.F.R. § 219.13(b)(6).

71.     Under the 2012 Rule, plans must also "maintain or restore the ecological integrity" in the plan area through plan components. *Id.* §§ 219.8(a)(1) & 219.9(a)(1).

72.     The 2012 Rule defines "ecological integrity" as "[t]he quality or condition of an ecosystem when its dominant ecological characteristics . . . occur within the natural range of variation and can withstand and recover from most perturbation imposed by natural environmental dynamics or human influence." 36 C.F.R. § 219.19.

73.     The 2012 Rule requires "the responsible official [t]o use the best available scientific information to inform the planning process," and to "document how the best available scientific information was used to inform the amendment decision." *Id.* § 219.3.

74.     The official's documentation must "[i]dentify what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issues considered." *Id.*

75.     In order to fulfill its obligation to provide for "diversity of plant and animal communities," USFS designates as "sensitive" those species "for which population viability is a concern" for each administrative region. FSM 2670.5.

76.     For designated "sensitive species," USFS management decisions "must not result in loss of species viability or create significant trends toward federal listing" under the ESA. *Id.* at 2670.32.

77.     The Forest Service Manual requires USFS to prepare biological evaluations for sensitive species "[t]o ensure that Forest Service actions do not contribute to loss of viability of any native or desired non-native plant or contribute to animal species or trends toward Federal listing of any species." *Id.* at 2672.4 & 2672.41(1).

78.     Just as for ESA-listed species, biological evaluations for sensitive species must discuss the cumulative effects of proposed actions on such species and determine whether proposed actions will have "no effect, beneficial effect, or 'may' [a]ffect"

sensitive species. FSM 2672.42(4) & (5). Biological evaluations must explain "the process and rationale for the determination" and USFS must then document that rationale in its relevant NEPA analyses. *Id.* at 2672.42(5).

## ADMINISTRATIVE PROCEDURE ACT

79.     Agency action is subject to judicial review pursuant to the APA, 5 U.S.C. §§ 701 *et seq.* Final agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (citation omitted).

80.     An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment. *See id.*

## FACTUAL BACKGROUND

### A.     Thunder Basin National Grassland

81.     The Thunder Basin National Grassland is located in the Powder River Basin of northeastern Wyoming. The TBNG consists of approximately 553,000 acres of National Forest System lands managed by USFS. TBNG 2020 Plan Amendment Final

EIS (2020 FEIS), p. 2. Nearly one million acres of state and private land are intermingled within these federal lands. *Id.*

82.     National Forest System lands on the TBNG are managed within USFS administrative hierarchy, including USFS Headquarters based in Washington, D.C.; the Rocky Mountain Region, based in Lakewood, Colorado; the Medicine Bow-Routt National Forests and Thunder Basin National Grassland, based in Laramie, Wyoming; and the Douglas Ranger District, based in Douglas, Wyoming. *Id.*

83.     The TBNG consists of open mixed and short-grass prairies, sagebrush ecosystems, and occasional badlands and steep hills. *Id.* It provides abundant natural resources and "extensive ecosystem services," including food, energy, biodiversity, recreation, scenic value, carbon storage, and plant and wildlife habitat. It is one of the last remaining areas in the United States with significant expanses of open mixed and short-grass prairies that can be utilized for the conservation and recovery of native wildlife and endangered species. *Id.*

84.     At the same time, the TBNG is also subject to extensive fossil fuel extraction and is heavily grazed by domestic livestock.



*Figure 1. Location of Thunder Basin National Grassland.* 2020 FEIS, p. 3.

85.    The TBNG is home to native species such as black-tailed prairie dogs, mountain plovers, and burrowing owls. Viability Impacts to Mountain Plover, Burrowing Owl, and Black-Footed Ferret Based on 2013 State of Wyoming Prairie Dog Strategy Amendment Request, p. 5 (USFS 2013) ("Viability Impacts").

86.    Due to the TBNG's ability to support prairie dog colonies of significant size, it has been identified as a reintroduction location for the ESA-listed black-footed ferret. *Id.*, p. 20.

**B.     Black-Tailed Prairie Dogs on the Thunder Basin National Grassland**

87.     Prairie dog species once occupied over 247 million grassland acres in North America. Viability Impacts, p. 4. The historic range of the black-tailed prairie dog included 11 states, Canada, and Mexico. The states that remain inhabited by prairie dogs include Arizona, Colorado, Kansas, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Texas, and Wyoming. The black-tailed prairie dog has been eradicated from all but two percent of its former range, and now occupies just 0.01% of its former range in the State of Wyoming. *Id.*, p. 2.

88.     Prairie dogs are a "keystone" species that creates habitat for a suite of other species, including mountain plovers, burrowing owls, and black-footed ferrets. *Id.*, p. 6. This ecosystem development and habitat creation is not duplicated by any other species. *Id.*

89.     Black-tailed prairie dogs are classified as a "Sensitive Species" in USFS's Rocky Mountain Region and as a "management indicator species" on the TBNG. 2020 FEIS, p. 4.

90.     In contrast, in Wyoming, prairie dogs are classified as an agricultural pest under state law. W.S. 11-5-102(a)(xii)). But paradoxically, they are also classified in Wyoming as a species of greatest conservation need. 2020 FEIS, p. 5.

91.     Because many Wyoming landowners eradicate prairie dogs from their private property, federally-managed national grasslands are disproportionately important for development of prairie dog colonies capable of supporting reintroduced black-footed ferret populations. A Reference Guide for the Black-Tailed Prairie Dog and Associated Species for Thunder Basin National Grassland, p. 7 (USFS 2014) ("Reference Guide").

92.    Many landowners consider prairie dogs to be pests because their burrowing and herbivory can affect livestock forage, dams, cemeteries, buildings, as well as the monetary value of pasture, residential, and other lands. 2020 FEIS, p. 5.

93.    Due to their highly social behavior, black-tailed prairie dogs are very susceptible to sylvatic plague, a fatal non-native disease that arrived on the TBNG in the late 1990s. Viability Impacts, p. 8; 2020 FEIS Appendix E, p. E-31. The species is also threatened by continued habitat loss, recreational shooting, and the commonly-held perspective that they are pests, resulting in indiscriminate killing. Viability Impacts, p. 8.

**C.    Black-Footed Ferrets and the Thunder Basin National Grassland**

94.    Black-footed ferrets are native to grasslands in the western United States and depend almost exclusively on prairie dogs for prey and their burrows for shelter. 2020 FEIS, p. 8. Ferrets were historically found wherever prairie dogs occurred. *Id.*

95.    Because prairie dogs have been eradicated from so much of their historic range, wild black-footed ferret populations all but disappeared from North America by the 1970s. Viability Impacts, p. 12.

96.    The federal government first recognized the black-footed ferret as endangered in 1967, a designation USFWS carried forward following the enactment of the ESA in 1973. Reference Guide, p. 7; *see also* 32 Fed. Reg. 4,001 (March 11, 1967).

97.    A single remaining wild ferret population was found near Meeteetse, Wyoming, in 1981. 2020 FEIS, p. 8. The most recent possible black-footed ferret sighting on the TBNG occurred in 1980 and the last confirmed sighting occurred before 1977. *Id.*

98.    Only 300 or so individual black-footed ferrets now exist in the wild, all descended from the rediscovered Meeteetse population following a captive-breeding program. *Id.*

99.    The TBNG has long been identified as a potential reintroduction site for black-footed ferrets due to the Grassland's relatively large number of contiguous federal land acres that can accommodate expansive prairie dog colony complexes. *See* Viability Impacts, p. 20.

100.    No other USFS-managed lands have been identified as potential black-footed ferret reintroduction sites in Wyoming. *See* Letter from USFWS to Regional Forester (March 16, 2007). The TBNG has at times been named one of the top three sites for future reintroduction in the country. Email from Peter McDonald, Threatened, Endangered, and Sensitive Species Program Leader, Rocky Mountain Region, USFS (Dec. 9, 2016).

101.    In 2007, the Regional Forester "committed USFS to providing habitat for future ferret reintroduction and said: 'Despite our important contribution to the national recovery program to this point, recovery of the black-footed ferret remains tenuous at best.'" Viability Impacts, p. 20. Further, the Regional Forester said, "[o]pportunities likely remain for the Forest Service to continue to be a leader in the national recovery effort." *Id.*

102.    An analysis of black-footed ferret reintroduction sites by a team of researchers determined that only reintroduction sites encompassing more than 10,621 acres of prairie dog colonies had self-sustaining ferret populations over multiple years.

*See* The Importance of Thinking Big: Large-Scale Prey Conservation Drives Black-Footed Ferret Reintroduction Success (Jachowski *et al.* 2011).

103.    In 2013, USFS biologists for the TBNG recognized this 10,621-acre threshold as the minimum number needed to support a viable population of black-footed ferrets on the Grassland. Viability Impacts, pp. 20–21; *see also* 2015 Black-Tailed Prairie Dog Conservation Assessment and Management Strategy, p. 12 (USFS 2015) ("2015 Strategy").

104.    In 2013, USFS biologists also determined that a State of Wyoming proposal to reduce prairie dog colony acres on the TBNG to approximately 10,000 "would preclude the opportunity to implement black-footed ferret reintroductions." Viability Impacts, pp. 2 & 17.

105.    In 2018, the Threatened, Endangered, and Sensitive Species Program Leader for USFS's Rocky Mountain Region affirmed that between 11,000 and 13,000 acres of prairie dog colonies sustained a small ferret population through a plague outbreak at a South Dakota reintroduction site, further underscoring the importance of geographic scale for the species' long-term survival. Email from Peter McDonald (July 25, 2018).

**D.    Mountain Plover Habitat Needs and Presence on the TBNG**

106.    USFS considers the mountain plover a "sensitive species" in the Rocky Mountain Region, which includes the TBNG. Viability Impacts, p. 50.

107.    Mountain plover populations range-wide have been declining since the middle of the 20th century and have continued to decline since 2000. 2020 FEIS Appendix E, p. E-139.

108.    Mountain plovers rely on prairie dog colonies for nesting habitat. Viability Impacts, p. 7.

109.    Threats to the mountain plover include prairie dog poisoning, shooting, and plague, recreational shooting, grazing, fire suppression, and climate change. *Id.*

110.    According to published scientific literature, a density of 0.0097 mountain plovers per acre and up to 20,582 acres of prairie dog colonies is needed to support a viable mountain plover population of 100 individuals. Viability Impacts, p. 18 (citing Augustine and Baker 2013).

111.    In 2013, USFS found the TBNG had well below 100 mountain plovers across 16,640 acres of active prairie dog colonies, and consequently determined that the TBNG may need over 20,000 acres of prairie dog colonies to meet mountain plover viability needs. *Id.*

112.    According to USFS, there are few to no mountain plovers on areas outside prairie dog colonies on the TBNG. 2020 FEIS Appendix E, p. E-141.

113.    Between 2015 and 2017, prairie dog colonies on the TBNG reached their greatest extent since 2000, encompassing up to 48,000 acres of federal lands within the Grassland boundary. 2020 FEIS, p. 6.

114.    During that same time, USFS observed its highest number of individual mountain plovers (297 in 2017) and mountain plover nests (66 in 2016) on the TBNG. 2020 FEIS Appendix E, p. E-141. USFS also observed mountain plover densities within active prairie dog colonies of 1.5 to 2.4 birds per 100 acres, depending on the size of the colonies. *Id.*

115.     Despite the 48,000 acres of prairie dog colonies on the TBNG at the time, a plague outbreak among prairie dogs that began in 2017 rapidly decreased the number of active prairie dog colonies within the TBNG's federal lands to just 2,438 acres in 2018, demonstrating how rapidly colony decimation can occur even on extensive acreage. 2020 FEIS, p. 6.

116.     The 2017 plague outbreak was exacerbated by USFS and Wyoming Game and Fish Department ("WGFD)" decisions to deny conservation groups the required permits to dust prairie dog colonies with deltamethrin, a chemical agent that kills the fleas that carry and spread sylvatic plague pathogens. The permits had been granted during previous years.

### E.     Memoranda of Understanding and 2015 10(j) Rule

117.     In 2013, USFS and other entities, including USFWS and WGFD, signed a Memorandum of Understanding ("MOU") expressing "support and agree[ment] to work collaboratively to develop and implement a 10(j) rule that designates all ferrets in the State of Wyoming as non-essential and experimental under the ESA." 2013 Memorandum of Understanding, p. 5.

118.     According to the 2013 MOU, WGFD would "serve as the lead agency for ferret recovery actions in the State of Wyoming," with USFWS offering "support." *Id.*, p. 7.

119.     The MOU stated that "future reintroductions of the [black-footed] ferret will be based on mutually affirmed prioritization of prospective reintroduction sites," giving the State of Wyoming veto power and ultimate authority for management decisions regarding reintroduction, including on federal lands like the TBNG. *Id.*, p. 8.

120.    In 2015, USFWS promulgated a regulation ("10(j) Rule") that designated all future reintroductions of black-footed ferrets in the State of Wyoming as "experimental, non-essential" populations pursuant to Section 10(j) of the ESA. 80 Fed. Reg. 66,821, 66,826 (codified in part at 50 C.F.R. § 17.84(g)) (Oct. 30, 2015).

121.    The 10(j) Rule also designated WGFD "as the lead agency in the reintroduction and subsequent management of black-footed ferret in Wyoming . . . ." 80 Fed. Reg. at 66,822.

122.    In 2018, USFS and the same other entities signed another MOU that made the delegation of authority to the State of Wyoming regarding black-footed ferret reintroduction even more explicit and formal. Under the 2018 MOU, WGFD "will plan to act as the lead agency for determining future ferret reintroduction areas and subsequent management" pursuant to the 10(j) Rule, again giving the State veto power and controlling authority over the management of federal lands within the TBNG. *See* 2018 Memorandum of Understanding, p. 3.[3]

**F.    TBNG Planning Decisions from 2002 to 2015**

123.    In 2002, USFS revised its management plan for the TBNG and designated 53,830 acres as Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat. 2020 FEIS, p. 8.

124.    The 2002 Revised Plan prohibited the shooting of prairie dogs in Management Area 3.63. 2002 Revised Plan, p. 3-17.

---

[3] On October 28, 2021 the same group of plaintiffs filed a related case in this Court challenging the 10(j) rule, WildEarth Guardians *et al.* v. USFWS *et al.*, Case No. 1:21-cv-02864-RDM.

125.     The 2002 Revised Plan also limited poisoning of prairie dogs anywhere on the Grassland except in the immediate vicinity of homes and cemeteries and to address public health and safety risks within specific locations. *Id.*, p. 1-23.

126.     The 2002 Revised Plan required USFS to replace net losses of black-footed ferret habitat due to prairie dog poisoning within one year, and to manage all prairie dog colonies within Management Area 3.63 as though they were occupied by black-footed ferrets. *Id.*, pp. 1-15 & 3-16.

127.     In the Final EIS for the 2002 Revised Plan, USFS determined that alternatives that did not allocate potential reintroduction habitat were "likely to adversely affect" black-footed ferrets because regardless of current occupation of habitat, a failure to manage for reintroduction would negatively impact the species. 2002 Revised Plan FEIS, pp. 3-270 & 3-274.

128.     In 2009, USFS amended the TBNG's 2002 Revised Plan to reduce the size of Management Area 3.63 to 44,420 acres, a loss of over 9,000 acres previously managed for ferret reintroduction. 2009 Amendment ROD, pp. 22–23. The 2009 Amendment also eliminated the requirement to mitigate losses of ferret habitat due to prairie dog poisoning. *Id.*, p. 11.

129.     The 2009 Amendment established four categories of prairie dog areas. *Id.*, p. 16. Most of Management Area 3.63 was designated as Category 1, where poisoning would be prohibited unless prairie dog colonies exceeded 18,000 acres. *Id.*, pp. 4 & 14.

130.     In the Category 1 area, the 2009 Amendment only allowed prairie dog poisoning within a half-mile of the TBNG boundary, and only after other non-lethal options to manage the spread of prairie dog colonies had been exhausted. *Id.*, p. 4.

131.    The 2009 Amendment prohibited the shooting of prairie dogs in Management Area 3.63 and Category 1 and 2 lands, increasing the portion of the TBNG closed to shooting from 72,500 to 96,000 acres. *Id.*, pp. 16 & 20. However, the 2009 Amendment allowed prairie dog shooting on Category 3 and 4 lands. *Id.*, p. 16.

132.    The ROD for the 2009 Amendment stated that USFS prohibited prairie dog shooting in Category 1 and 2 lands because recreational shooting "can disrupt prairie dog behavior and affect population dynamics." *Id.*, p. 20.

133.    The ROD also stated that USFS "remains committed to the goal of reintroducing the endangered black-footed ferret to the TBNG" despite awareness that "[m]ost livestock producers in the Great Plains do not support the expansion of prairie dog colonies because . . . they are viewed as competing for forage for their livestock." 2009 Amendment ROD, p. 21.

134.    USFS stated that the 2009 Amendment was "expected to provide long term conservation of prairie dogs and contribute to conditions necessary to support a future ferret reintroduction in [Management Area] 3.63." *Id.*, p. 22.

135.    USFS also said that the selected alternative "would help gain local public support for prairie dog conservation and black-footed ferret recovery on the TBNG, which would facilitate a future reintroduction while still maintaining for viability and conservation of these species." *Id.*, p. 24.

136.    Then, in 2015, USFS adopted a Black-Tailed Prairie Dog Conservation Assessment and Management Strategy that consolidated the four categories of prairie dog colony acres adopted by the 2009 Amendment into three categories and removed

restrictions on prairie dog shooting in Category 2 areas when acreage objectives were met. 2015 Strategy, pp. 4 & 9.

137.    Within Management Area 3.63, the 2015 strategy continued to set an 18,000-acre prairie dog colony objective and trigger point for when poisoning could occur. *Id.*, p. 12.

138.    In the 2015 strategy document, USFS stated: "It is anticipated that 18,000 acres will be sufficient habitat to allow ferrets to persist through a plague epizootic and recover naturally along with the prairie dog populations, particularly since a minimum of 10,621 acres of prairie dogs at a moderate density are needed to support a self-sustaining population of ferrets (Jachowski *et al.* 2011)." 2015 Strategy, p. 12.

**G.    2019 USFWS Species Status Assessment for the Black-Footed Ferret**

139.    In January 2020, USFWS issued a Species Status Assessment ("SSA") for the black-footed ferret.

140.    The SSA did not fully account for sylvatic plague and other stressors. However, it revealed that of the 29 sites where ferrets have been reintroduced, only 14 remain active. Species Status Assessment, p. i. Of the remaining active reintroduction sites, only two are in a high resiliency condition, eight are in a moderate resiliency condition, and four are in a low resiliency condition. *Id.*, p. ii. Fifteen sites have been extirpated, largely due to sylvatic plague. *Id.*

141.    According to the SSA, black-footed ferret conservation efforts must increase from current levels to ensure the future viability of the species. Species Status Assessment, pp. ii & 83.

142.     In the SSA, USFWS determined that "recreational shooting of prairie dogs likely limits the carrying capacity for ferrets at reintroduction sites." *Id.*, p. 28. Additionally, "recreational shooting may decrease black-footed ferret population resiliency in localized situations, particularly at reintroduction sites located in black-tailed prairie dog habitat." *Id.*

143.     According to USFWS, "the likelihood of entire populations of black-footed ferrets being extirpated during sylvatic plague epizootics is high (Shoemaker et al. 2014), and the effects of plague can be exacerbated by other stressors such as drought and recreational shooting." *Id.*, p. 17.

144.     The SSA illustrated the need for active conservation of black-footed ferrets and their habitat, and predicted "that the effects of sylvatic plague and lack of suitable habitat will continue to limit the viability of the black-footed ferret, and management inputs will continue to be required in order to maintain current levels of viability." Species Status Assessment, p. ii. USFWS additionally noted that "management inputs will need to be expanded and improved in effectiveness in order to increase viability for the species." *Id.*

145.     The SSA stated that resiliency of black-footed ferret populations is low and that "plague management and black-footed ferret vaccination" is needed "to keep individual sites from succumbing to sylvatic plague epizootics." *Id.*, p. 65.

**H.     Events Leading up to the 2020 TBNG Plan Amendment Process**

146.     In 2017, under pressure from agricultural interests, USFS joined an Interagency Statement with USFWS and WGFD announcing an agreement that "the

reintroduction of black-footed ferrets on the Grassland is not appropriate at this time."
Interagency Statement (Dec. 4, 2017).

147.    This announcement came just over a year after the Governor of Wyoming,
WGFD, the Wyoming Office of State Lands and Investments, and the Wyoming
Department of Agriculture sent letters informing USFS that Wyoming does not support
reintroduction of black-footed ferrets on the TBNG. *See* Thunder Basin and Black-Footed
Ferrets Talking Points (WGFD Aug. 14, 2018).

148.    Also in 2017, the Regional Forester pushed to "break the link between
BFF [black-footed ferrets] and PDogs [prairie dogs] in plan components[,]" despite
USFS's earlier acknowledgment that the prairie dog is a keystone species upon which
ferrets rely nearly exclusively for food and shelter. Rocky Mountain Regional Office
Meeting Notes (Feb. 4, 2019); *see also* Viability Impacts, p. 20.

149.    Between 2017 and 2018, a plague outbreak decimated prairie dog colonies
on the TBNG, reducing the number of active colony acres within Management Area 3.67
to just 250, and across the federal lands within the TBNG's boundaries to just 625. 2020
FEIS, p. 6. By 2019, active prairie dog colony acres had increased to 1,065 in
Management Area 3.67 and 2,438 across all federal lands within the TBNG. *Id.*

150.    Despite this rapid and drastic decrease in prairie dog colony acres, USFS
proceeded to amend the TBNG Plan at the behest of livestock interests. *See* Letter from
Wyoming Department of Agriculture to Forest Supervisor (Dec. 28, 2018).

**I.      2020 Plan Amendment Final EIS**

151.    In developing the 2020 Amendment, USFS determined that Section 219.8(a) and Section 219.9 of the 2012 Rule apply. 2020 FEIS, p. 12; 2020 ROD, pp. 32–33.

152.    In the Final EIS for the 2020 Amendment, USFS recognized that "[a]s a Federal agency, the Forest Service has responsibility to contribute to recovery of threatened and endangered species according to section 7 of the Endangered Species Act." 2020 FEIS, p. 8. USFS also stated that "when necessary, species-specific plan components must be in place to provide ecological conditions to contribute to the recovery of federally listed threatened and endangered species." *Id.* (citing 36 C.F.R. § 219.9(b)(2)).

153.    USFS also acknowledged that since the 2002 plan revision, "prairie dog management on the Thunder Basin National Grassland has focused on expanding prairie dog colonies to provide habitat and promote reintroduction of black-footed ferrets." *Id.*

154.    Yet for the 2020 Amendment, USFS crafted a narrow purpose and need statement directly aimed at eliminating and weakening existing protections for black-footed ferret reintroduction habitat and prairie dog colonies. *See* 2020 FEIS, p. 17.

155.    Rather than proactively manage the Grassland to contribute to black-footed ferret recovery, USFS stated that the purpose of the proposed amendment is to "provide a wider array of management options to respond to changing conditions; minimize prairie dog encroachment onto non-Federal lands; reduce resource conflicts related to prairie dog occupancy and livestock grazing; ensure continued conservation of at-risk species; and support ecological conditions that do not preclude reintroduction of the black-footed ferret." *Id.*

156.    USFS said the proposed amendment is needed to "revise management direction in Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat, adjust the boundaries of management area 3.63 to be more conducive to prairie dog management; and increase the availability of lethal prairie dog control tools . . . ." *Id.*

157.    In its "Purpose and Need Statement," USFS never established that the 2002 Revised Plan (as amended) needed to change. USFS never addressed the fact that the 2002 Revised Plan, 2009 Amendment, and 2015 Strategy had never been fully and properly implemented.

158.    USFS contends that "[t]he initial use of nonlethal prairie dog methods in management area 3.63, as directed in the strategy, proved inefficient and costly, and implementation of the strategy was unsuccessful in addressing encroachment onto private and State lands." *Id.*, p. 14. USFS goes on to assert that "[u]se of some key prairie dog management tools such as translocation and prescribed burning has been halted over the past decade because of local social resistance to them." 2020 FEIS, p. 14.

159.    USFS failed to recognize that non-governmental organizations paid for most translocation efforts in 2010 and 2011, and those efforts and buffer fences worked as pledged. USFS itself discontinued the use of translocation as a tool and removed one of two buffer fences due to pressure from livestock interests.

160.    The Final EIS for the 2020 Amendment evaluated five alternatives. 2020 FEIS, p. i. Alternative 1, the "no action" alternative, would continue management under the 2002 Revised Plan as previously amended and the 2015 Strategy. *Id.*

161.    Alternative 2, the proposed action, would eliminate Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat and replace it with a smaller

Management Area 3.67 – Short-Stature Vegetation Emphasis, with boundary management zones around the new area. *Id.* The prairie dog colony objective within Management Area 3.67 would be 10,000 acres. *Id.* The proposed action would allow prairie dog poisoning using zinc phosphide, and seasonal recreational shooting in Management Area 3.67. *Id.*

162.    Alternative 3, the "Grassland-Wide Alternative," would similarly eliminate Management Area 3.63 and replace it with a smaller Management Area 3.67. *Id.* The prairie dog colony objective would be 10,000 to 15,000 acres across the entire TBNG, with at least one 1,500-acre complex within Management Area 3.67 *Id.* This alternative would establish boundary management zones Grassland-wide, allow prairie dog poisoning by anticoagulants and fumigants within such zones. *Id.*, pp. i–ii. Elsewhere, poisoning by zinc phosphide could occur. *Id.* No restrictions on recreational shooting of prairie dogs would occur under this alternative. *Id.*

163.    Alternative 4, the "Prairie Dog Emphasis Alternative," would replace Management Area 3.63 with Management Area 3.67, but keep the same size and boundaries for the new area. 2020 FEIS, p. ii. The alternative would set a prairie dog colony objective of 18,000 acres in specific areas within Management Area 3.67 with associated boundary management zones. *Id.* This alternative would allow prairie dog poisoning using zinc phosphide and prohibit recreational shooting within Management Area 3.67. *Id.*

164.    Alternative 5, USFS's preferred alternative, is nearly identical to Alternative 2, the proposed action, except Alternative 5 would allow prairie dog poisoning through the use of fumigants in addition to zinc phosphide. *Id.*

165.    USFS declined to consider in detail an alternative reinstituting management under the unamended 2002 Revised Plan. Reviewing Officer's Response to Objections, pp. 8–9.

166.    All action alternatives considered by USFS for the 2020 Amendment "de-emphasize" the reintroduction of ferrets to refocus management on providing forage for livestock grazing. 2020 FEIS, p. 60; 2020 FEIS Appendix C, p. C-2.

167.    Both the Biological Evaluation and Biological Assessment that USFS prepared for the 2020 Amendment determined that because black-footed ferrets have been extirpated from the TBNG, the amendment would have "no effect" on the species, despite dramatically altering management of the species' unoccupied habitat that the agency earlier identified as key to future reintroduction and recovery, and despite major expansions of prairie dog shooting and poisoning within the former Management Area 3.63 and throughout the TBNG. 2020 Biological Assessment, p. 8; 2020 FEIS Appendix E, p. E-42.

168.    The Final EIS also cursorily determined that the 2020 Amendment would have "no effect" on "extirpated, non-essential, experimental populations of the black-footed ferret." 2020 FEIS, p. 133.

169.    In the Final EIS, USFS evaluated alternative prairie dog colony objectives against the acreage requirements drawn from USFWS's 2013 Black-Footed Ferret Recovery Plan and WGFD's 2018 Black-Footed Ferret Management Plan. *Id.*, p. 133. According to the Final EIS, these plans require a minimum of 1,500 prairie dog colony acres for a site to be considered for ferret reintroduction, and state that 4,500 and 15,000

prairie dog colony acres are needed to support 30 and 100 breeding adult black-footed ferrets, respectively. *Id.*, pp. 133–136.

170.    Based on the 1,500 and 4,500-acre figures, USFS determined that three of the action alternatives considered "meet the requirements for reintroduction and do not preclude the reintroduction of ferrets, should the species be considered for reintroduction on the Thunder Basin National Grassland," while the other action alternative "do[es] not preclude the reintroduction of ferrets . . . ." *Id.*, pp. 134–136.

171.    However, USFS did not evaluate alternative prairie dog colony objectives against the 10,621-acre threshold the agency itself previously recognized as the minimum necessary for a viable reintroduced ferret population. *See* Viability Impacts, pp. 20–21.

172.    USFS contends the 10,000-acre prairie dog colony objective "approximates the minimum colony extent necessary to provide ecological conditions for prairie dog-associated species," despite earlier finding that 18,000 acres would be "sufficient" to allow ferrets to persist through plague epizootics, and that ferrets require a minimum of 10,621 prairie dog colony acres for a self-sustaining population. 2020 FEIS, p. 70; Viability Impacts, pp. 20–21; 2015 Strategy, p. 12.

173.    Neither the Final EIS nor USFS's Biological Assessment for the 2020 Amendment examined the combined, cumulative, or synergistic impacts of increased poisoning, density control, recreational shooting, and plague on prairie dog populations and colony acres, obligate species, or ferret reintroduction habitat, or the possibility that these three combined stressors could lead to prairie dog extirpation.

174.    USFS acknowledges that "prairie dog disturbance is within the natural range of variation on the Thunder Basin National Grassland," but then admits that

ecological site descriptions and modeling used for the Final EIS did not include prairie dog colony occupancy as a key characteristic. 2020 FEIS, pp. 68 & 80.

175.    USFS identified black-tailed prairie dogs, burrowing owls, and mountain plovers as potential SCC for the 2020 Amendment. 2020 FEIS Errata, pp. 3–6.

176.    In the Final EIS, USFS says that, of all prairie dog-dependent species, mountain plovers require the most acreage due to their lower population densities and greater susceptibility to habitat changes. 2020 FEIS, p. 50. According to USFS, meeting the minimum acreage needs for mountain plovers will satisfy acreage needs for all other prairie dog-dependent species, including prairie dogs themselves. *Id.*

177.    According to USFS, the 10,000-acre prairie dog colony objective in Management Area 3.67 "is the lower limit likely to adequately provide for the long-term persistence of the mountain plover population on the national grassland." 2020 FEIS, p. 50; *see also id.*, p. 70 ("10,000 acres approximates the minimum colony extent necessary to provide ecological conditions for prairie dog-associated species.").

178.    The Biological Evaluation that USFS prepared regarding mountain plovers determined that the 2020 Amendment "may adversely affect individuals, but [is] not likely to result in a loss of viability in the planning area, nor cause a trend toward Federal listing" because "the effects are expected to be localized." 2020 FEIS Appendix E, p. E-152.

179.    USFS undertook no analysis of how removing Management Area 3.63, increasing poisoning within the new Management Area 3.67 and throughout the TBNG, and lifting the previous prohibition against prairie dog shooting within Management Area 3.63 for five and a half months of the year would impact prairie dog populations, future

reintroduction and recovery of black-footed ferrets, or other prairie dog-dependent species.

**J.      Record of Decision for the 2020 Amendment**

180.    The ROD for the 2020 Amendment explicitly adopts a new plan standard stating that "any effort to reintroduce black-footed ferret shall occur in coordination with the Wyoming Game and Fish Department and the U.S. Fish and Wildlife Service," despite WGFD expressing opposition to ferret reintroduction on the TBNG. 2020 ROD, p. 74; Thunder Basin and Black-Footed Ferrets Talking Points (WGFD Aug. 14, 2018).

181.    The ROD also eliminates Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat, and replaces it with Management Area 3.67 – Short-Stature Vegetation Emphasis. 2020 ROD, p. 3.

182.    Within the new Management Area 3.67, USFS set a prairie dog colony objective of 10,000 acres. *Id.*, p. 3. During drought years, which the agency admits will occur more frequently in the future due to climate change, this objective is reduced further to just 7,500 acres. 2020 FEIS, p. 69; 2020 ROD, p. 3.

183.    Even in non-drought years, once prairie dog colonies grow beyond 7,500 acres in Management Area 3.67, USFS may authorize poisoning throughout the area to limit their growth, despite colonies not yet reaching the 10,000-acre objective. 2020 ROD, p. 3.

184.    The ROD also expands prairie dog poisoning options to boundary management zones and one-mile residence buffers. *Id.*

185.    USFS also now allows recreational shooting of prairie dogs in Management Area 3.67 for five and a half months of each year. *Id.*

186.     Despite the SSA's emphasis on plague management, the 2020 Amendment does not commit to any specific actions related to plague. Instead, it merely adopts an objective to develop a plague management plan within three years. *Id.*, p. 47. The 2020 Amendment vaguely says "[a]n integrated approach to plague management . . . will be implemented annually" in Management Area 3.67. *Id.*, p. 74.

187.     As a result of the 2020 Amendment, there are now no areas within the TBNG where prairie dogs are protected from shooting and poisoning, threatening the viability of prairie dog populations, obligate species like mountain plovers on the TBNG, and future black-footed ferret reintroduction efforts.

188.     In the ROD, USFS admits the 2020 Amendment "decision does not base the design of all plan components on those conditions common in the past relative to the natural range of variation." *Id.*, p. 36.

189.     USFS further admits that "anthropogenic control of prairie dogs to manipulate the size, extent, and location of prairie dog colonies is not part of the natural range of variation for the ecosystem." *Id.*

190.     Instead, USFS contends that "deviation from the natural range of variation" is "appropriate to achieve the integrated desired conditions for management on the grassland." 2020 ROD, p. 36.

## FIRST CAUSE OF ACTION

### Violation of the National Environmental Policy Act

### Impermissibly Narrow and Unlawful Purpose and Need Statement

191.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

192.    Federal agencies must "briefly specify the underlying purpose and need for [a] proposed action." 40 C.F.R. § 1502.13. The purpose and need must be reasonable in light of the information USFS has before it.

193.    Agencies may not state an "unreasonably narrow" purpose and need that forecloses consideration of reasonable alternatives or makes an agency's preferred result a "foreordained formality." The reasonableness of a purpose and need statement must be determined against an agency's statutory mandates. *See Citizens Against Burlington, Inc.*, 938 F.2d at 196.

194.    An enumerated purpose of the 2020 Amendment is to "support ecological conditions that do not preclude reintroduction of the black-footed ferret." 2020 FEIS, p. 17.

195.    This purpose runs counter to Congress's stated policy in Section 2 of the ESA that all federal agencies "shall seek to conserve [listed] species and shall utilize their authorities in furtherance of the purposes of" the ESA, and counter to the ESA's mandate that federal agencies "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered and threatened species . . . ." 16 U.S.C. § 1531(c)(1); *Id.* § 1536(a)(1).

196.    USFS asserts it needed to amend the TBNG Plan to "revise management direction in Management Area 3.63," to "adjust the boundaries of Management Area 3.63 to be more conducive to prairie dog management," and to "increase the availability of lethal prairie dog control tools to improve responsiveness to a variety of management situations . . . ." 2020 FEIS, p. 17. Yet USFS fails to establish that existing management

direction provided by the 2002 Revised Plan as amended and the 2015 Strategy could not address these concerns if fully and effectively implemented.

197.     USFS's purpose and need statement for the 2020 Amendment is impermissibly narrow and unreasonable because it runs directly counter to the agency's affirmative ESA obligations and foreordains the selection of an alternative that reduces protections for prairie dogs and decreases the likelihood of black-footed ferret reintroduction on the TBNG.

198.     USFS's impermissibly narrow and unreasonable purpose and need statement violates NEPA, 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1502.13, and is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

## Failure to Consider a Range of Reasonable Alternatives

199.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

200.     NEPA requires that an agency consider a range of reasonable alternatives in an EIS. 40 C.F.R. § 1502.14. Alternatives that do not meet an agency's statutory obligations, however, are not reasonable.

201.     Alternatives considered by USFS for the 2020 Amendment must meet the agency's statutory mandate to "utilize [its] authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species . . . ." 16 U.S.C. § 1536(a)(1).

202.     Rather than further the purposes of the ESA and carry out programs to conserve the endangered black-footed ferret, the action alternatives "de-emphasize" and hamper ferret reintroduction, the proposed and preferred alternatives set prairie dog

colony acreage objectives below the threshold needed for a viable ferret population, and increase poisoning and recreational shooting of prairie dogs to the extent that the TBNG could not support a self-sustaining ferret reintroduction.

203.    The "Grassland-Wide Alternative," meanwhile, purports to provide enough prairie dog colony acres to support ferret reintroduction, but such "colonies may not be in close enough proximity to provide ideal reintroduction areas." 2020 FEIS, p. 135. Further, this alternative allows "the use of anticoagulants in the boundary management zone [which] would make the site a low priority for allocation of ferrets." *Id.*

204.    Alternatives considered by USFS for the 2020 Amendment must also satisfy NFMA's "diversity" requirement by complying with the 2012 Rule.  16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. §§ 219.1 *et seq*.

205.    Several action alternatives USFS considered for the 2020 Amendment do not comply with the 2012 Rule's requirements to "provide the ecological conditions necessary to contribute to the recovery of federally listed threatened and endangered species" and to "maintain a viable population of each [potential] species of conservation concern within the plan area." 36 C.F.R. § 219.9(b)(1).

206.    The proposed and preferred alternatives include prairie dog colony acreage objectives of 10,000 acres (and just 7,500 acres in ever-more-common drought years), below the level needed to support a self-sustaining reintroduced ferret population, and therefore below the level needed to contribute to the recovery of this endangered species.

207.    The action alternatives' prairie dog colony acreage objectives are below the level needed to maintain the viability of mountain plovers, a potential SCC for the TBNG, which may require 20,000 acres for a viable population.

208.    Only the "no action" alternative nominally meets the agency's statutory obligations under the ESA and NFMA. As such, USFS has not considered a range of reasonable alternatives for the 2020 Amendment.

209.    The action alternatives considered also do not meet USFS's stated purposes to "ensure continued conservation of at-risk species" and to "support ecological conditions that do not preclude reintroduction of the black-footed ferret" on the TBNG.

210.    Reinstituting the unamended 2002 Revised Plan, however, would meet these purposes and is within the range of reasonable alternatives USFS must consider in detail, yet the agency refused to do so.

211.    USFS's failure to consider a full range of reasonable alternatives in the Final EIS for the 2020 Amendment violates NEPA, 42 U.S.C. § 4332(2)(C), and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

### Failure to Take a "Hard Look" at the Impacts of the 2020 Amendment

212.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

213.    NEPA requires federal agencies to take a "hard look" at any impacts of proposed actions, including direct, indirect, and cumulative impacts. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, & 1508.25(c).

214.    To comply with NEPA's "hard look" requirement, USFS's analysis must facilitate informed decision-making and public participation by providing specific, detailed study of the possible effects and risks of proposed actions.

215.    In the Final EIS for the 2020 Amendment, USFS failed to take a "hard look" at impacts to black-tailed prairie dogs, colony development, and prairie dog obligate species like mountain plovers from the combination of plague with poisoning and recreational shooting authorized under the considered alternatives. USFS did not evaluate whether these combined threats could result in the extirpation of prairie dogs from Management Area 3.67 or the TBNG.

216.    USFS further failed to take a "hard look" at how the combination of these threats to prairie dog colony development and the resulting possibility of prairie dog extirpation could impact the likelihood of black-footed ferret reintroduction on the TBNG.

217.    USFS also failed to take a "hard look" at how alternatives considered for the 2020 Amendment would impact the likelihood of future ferret reintroduction and success in light of the best available science showing that black-footed ferret populations require at least 10,621 acres of active prairie dog colonies to be viable and self-sustaining.

218.    Because USFS failed to provide discussion, analysis, evaluation, or consideration of the combined effects of plague, poisoning, and recreational shooting on prairie dogs, colony development, obligate species, and the likelihood of ferret reintroduction, as well as failed to provide discussion, analysis, evaluation, or consideration of the likelihood of ferret reintroduction and success in light of necessary

prairie dog colony acreage thresholds, the agency has not satisfied its obligations under NEPA to provide the public with the requisite "hard look." The 2020 Amendment ROD and EIS thus violate NEPA, 42 U.S.C. § 4332(2)(C), and must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**

**Violation of Endangered Species Act § 7**

**Failure to Satisfy Affirmative Duty to Conserve**

219.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

220.    Pursuant to Section 7(a)(1) of the ESA, USFS must affirmatively "utilize [its] authorities in furtherance of the purposes of the [ESA] by carrying out programs for the conservation of endangered species" like the black-footed ferret. 16 U.S.C. § 1536(a)(1).

221.    "Conservation" means "to use and the use of all methods and procedures which are necessary to bring any endangered species . . . to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3).

222.    USFS must prioritize the conservation species listed as threatened or endangered even above its own primary mission. *Tenn. Valley Auth.*, 437 U.S. at 185.

223.    USFS's Forest Service Manual and planning regulations reiterate this affirmative duty to place top priority on ESA-listed species' conservation and recovery and provide the ecological conditions necessary to contribute to ESA-listed species' recovery. *See* FSM 2670.31(1); *see also* 36 C.F.R. § 219.9(b)(1).

224.    Insignificant measures that do not or are not reasonably likely to conserve endangered species fail to satisfy federal agencies' Section 7(a)(1) obligations. *See Florida Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir. 2008); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1418-19 (9th Cir. 1990).

225.    All alternatives considered by USFS for the 2020 Amendment de-emphasize black-footed ferret reintroduction on the TBNG and merely aim to "not preclude reintroduction" of the species, including the selected alternative. The 2020 Amendment thus does not affirmatively conserve black-footed ferrets nor affirmatively contribute to their recovery.

226.    The 2020 Amendment adopted by USFS eliminates Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat from the TBNG Plan and replaces it with Management Area 3.67 – Short-Stature Vegetation Emphasis, focused on livestock production, while at the same time increasing poisoning and recreational shooting of prairie dogs and reducing the prairie dog colony acre objective below the minimum threshold for a viable, self-sustaining reintroduced ferret population, contrary to its obligation to provide ecological conditions necessary to contribute to the species' recovery. *See* 36 C.F.R. § 219.9(b)(1).

227.    USFS's determination that the 2020 Amendment's prairie dog colony objective would "not preclude reintroduction" of black-footed ferrets to the TBNG runs counter to the best available science showing the 2020 Amendment's 10,000-acre prairie dog colony objective (just 7,500 acres during increasingly common drought years) will preclude sustainable reintroduction efforts. The 2020 Amendment's prairie dog colony objective fails to meet the threshold for a viable, self-sustaining reintroduced black-

footed ferret population. The 2020 Amendment thus is an insignificant measure that does not and is not reasonably likely to conserve the species.

228.    USFS is not utilizing its authorities in furtherance of the purposes of the ESA by carrying out programs to conserve black-footed ferrets because USFS is not using methods or procedures to bring the black-footed ferret to the point at which protection under the ESA will no longer be necessary.

229.    Further, by entering the 2013 and 2018 Memoranda of Understanding, which designated WGFD as the lead agency for determining the location of future black-footed ferret reintroductions in Wyoming, including on federally-managed TBNG acres, USFS inappropriately ceded its authority to manage the Grassland in furtherance of the purposes of the ESA, contrary to its Section 7(a)(1) obligations. The ROD for the 2020 Amendment adopts this improper cession of authority through the inclusion of a standard requiring that black-footed ferret reintroduction on the TBNG may occur only with WGFD's consent.

230.    By de-emphasizing black-footed ferret reintroduction and aiming to merely "not preclude reintroduction" through the 2020 Amendment, USFS has not placed top priority on the species' conservation and recovery, contrary to and without explanation for its deviation from the agency's own Manual. *See* FSM 2670.31(1).

231.    USFS's failure and/or refusal to provide for the conservation of black-footed ferrets in the 2020 Amendment, and its decision to instead eliminate and reduce previous conservation measures and defer to the State of Wyoming regarding future reintroduction within the TBNG, violate Section 7 of the ESA, 16 U.S.C. § 1536, and is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

### Violation of National Forest Management Act

### Failure to Use the Best Available Science

232.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

233.    Regulations promulgated by USFS to implement NFMA require the agency to "use the best available scientific information to inform the planning process," including when amending a plan. 36 C.F.R. § 219.3.

234.    Yet in adopting the 2020 Amendment to the TBNG Plan, USFS ignores the best available science regarding requirements for successful black-footed ferret reintroduction. According to USFS's "Viability Impacts" document prepared in response to a 2013 proposal by the State of Wyoming to reduce prairie dog colony objectives on the TBNG, black-footed ferrets require a minimum of 10,621 acres of active prairie dog colonies for a viable, self-sustaining reintroduced population. Viability Impacts, pp. 20–21 (citing Jachowski *et al.* 2011). USFS reiterated its recognition of this threshold in its 2015 Black-Tailed Prairie Dog Conservation Assessment and Management Strategy. 2015 Strategy, p. 12.

235.    Despite this scientific information in its possession and indeed previously recognized by the agency, USFS selected an alternative for the 2020 Amendment that sets a prairie dog colony objective of 10,000 acres, and just 7,500 acres during increasingly common drought years, both of these acreages below the threshold needed

for successful black-footed ferret reintroduction. Yet USFS still asserted the 2020 Amendment would "not preclude reintroduction" of the black-footed ferret to the TBNG.

236.    Similarly, USFS's "Viability Impacts" document recognizes that mountain plovers require a density of 0.0097 birds per acre across as much as 20,000 acres of prairie dog colonies for a viable population of 100 birds. Viability Impacts, p. 18 (citing Augustine and Baker 2013).

237.    Again, despite this scientific information in its possession and previously recognized by the agency, USFS selected an alternative for the 2020 Amendment that sets a prairie dog colony objective of 10,000 acres, and just 7,500 acres during increasingly common drought years, well below the acreage needed for a viable mountain plover population. Yet USFS still asserted the 2020 Amendment would provide the ecological conditions necessary for a viable population of this species, and determined the 2020 Amendment would not lead to a loss of the mountain plover's viability on the TBNG.

238.    USFS's failure to use the best available scientific information regarding habitat needs for successful black-footed ferret reintroduction and mountain plover viability violates NFMA and 36 C.F.R. § 219.3, and USFS's ROD for the 2020 Amendment must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

### Failure to Provide Necessary Ecological Conditions

239.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

240.    NFMA requires USFS to "provide for diversity of plant and animal communities" through planning regulations. 16 U.S.C. § 1604(g)(3)(B).

241.     The 2012 Rule promulgated to meet this mandate requires USFS to "provide the ecological conditions necessary" to both "contribute to the recovery of federally listed endangered and threatened species" and "maintain a viable population of each species of conservation concern within the plan area . . . ." 36 C.F.R. § 219.9(b)(1).

242.     For purposes of the 2020 Amendment, USFS determined black-tailed prairie dogs, burrowing owls, and mountain plovers are potential SCC and as such, must be treated as SCC under the 2012 Rule. *See* 36 C.F.R. § 219.13(b)(6).

243.     The 2020 Amendment sets a prairie dog colony objective of 10,000 acres, but just 7,500 acres during increasingly common drought years. The best available science before the agency shows that mountain plovers need up to 20,000 acres of prairie dog colonies to support a viable population of 100 birds. The 2020 Amendment thus does not provide the ecological conditions necessary to maintain a viable population of this potential SCC on the TBNG.

244.     The 2020 Amendment adopted by USFS eliminates Management Area 3.63 – Black-Footed Ferret Reintroduction Habitat from the TBNG Plan and replaces it with Management Area 3.67 – Short-Stature Vegetation Emphasis, while at the same time increasing poisoning and recreational shooting of prairie dogs and reducing the prairie dog colony acre objective below the minimum threshold for a viable, self-sustaining reintroduced ferret population, contrary to its obligation to provide ecological conditions necessary to contribute to the species' recovery.

245.     The 2020 Amendment fails to provide the ecological conditions necessary to contribute to black-footed ferret recovery or to maintain a viable population of mountain plovers on the TBNG, in violation of NFMA and 36 C.F.R. § 219.9(b)(1).

USFS's ROD for the 2020 Amendment must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

### Failure to Maintain or Restore Ecological Integrity

246.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

247.    Under the 2012 Rule, USFS must "maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area . . . ." 36 C.F.R. §§ 219.8(a)(1) & 219.9(a)(1)."Ecological integrity" is defined as "[t]he quality or condition of an ecosystem when its dominant ecological characteristics . . . occur within the natural range of variation and can withstand and recover from most perturbation imposed by natural environment dynamics or human influence." 36 C.F.R. § 219.19.

248.    The ecological site descriptions and modeling relied upon by USFS for the 2020 Amendment do not include prairie dog colony occupancy as a key characteristic despite the agency's recognition that prairie dog disturbance is within the natural range of variation on the TBNG. 2020 FEIS, pp. 68 & 80.

249.    USFS admits that the 2020 Amendment "decision does not base the design of all plan components on those conditions common in the past relative to the natural range of variation" and that "anthropogenic control of prairie dogs to manipulate the size, extent, and location of prairie dog colonies is not part of the natural range of variation for the ecosystem." 2020 ROD, p. 36.

250.    The Final EIS failed to analyze whether the combined effects of prairie dog poisoning, recreational shooting, and plague could lead to extirpation of prairie dogs on the TBNG. USFS thus has not ensured that the 2020 Amendment will maintain or

restore the ecological integrity of the TBNG such that prairie dog colonies can withstand and recover from both these natural environment dynamics and human influences.

251.    Because USFS admittedly failed to base the 2020 Amendment on the natural range of variation related to prairie dog colony expansion, and failed to ensure its decision will maintain or restore the ecological integrity of the TBNG, the 2020 ROD violates NFMA and 36 C.F.R. §§ 219.8(a)(1) and 219.9(a)(1) and must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that USFS violated NEPA by stating an impermissibly narrow and unreasonable purpose and need for the 2020 Amendment, failing to consider a range of reasonable alternatives for the 2020 Amendment, and failing to take a "hard look" at impacts to black-tailed prairie dogs, species that depend on prairie dog colony habitat, and potential black-footed ferret reintroduction from the 2020 Amendment;

2. Set aside USFS's Final Environmental Impact Statement and Record of Decision for the 2020 Amendment and remand to USFS for further action consistent with the requirements of NEPA;

3. Declare that USFS violated Section 7(a)(1) of the ESA in connection with USFS's issuance of the 2020 Record of Decision;

4. Set aside USFS's Record of Decision for the 2020 Amendment and remand the issue of black-footed ferret reintroduction habitat and efforts on the TBNG to USFS for further action consistent with the requirements of the ESA;

5.  Declare that USFS violated NFMA in connection with the 2020 Amendment;

6.  Set aside USFS's Record of Decision for the 2020 Amendment and remand the issue of compliance with 36 C.F.R. §§ 219.3, 219.8(a)(1), 219.9(a)(1), and 219.9(b)(1) to USFS for further action consistent with NFMA and its implementing regulations;

7.  Retain jurisdiction of this action to ensure compliance with the Court's decree;

8.  Award Plaintiffs their reasonable fees, costs, and expenses associated with this litigation, including attorneys' fees authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and other applicable provisions; and

9.  Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 18th day of November, 2021,

/s/ John Persell
John Persell (D.D.C. Bar # ID0002)
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
(503) 896-6472
jpersell@westernwatersheds.org

/s/ Matthew Sandler
Matthew Sandler (D.D.C. Bar # CO0105)
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver, CO 80202
303-579-5162
matt@rockymountainwild.org

/s/ Jennifer Schwartz
Jennifer Schwartz (D.D.C. Bar # OR072978)
WildEarth Guardians
P.O. Box 12086
Portland, OR 97213
(503) 780-8281

jschwartz@wildearthguardians.org